IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOHAMMAD J. ABDULRAFI,<br><br>    Petitioner,<br><br>  v.<br><br>BILL LOCKYER,<br><br>    Respondent. | No. C 02-04702 WHA<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER EVIDENTIARY HEARING** |

Petitioner Mohammad J. Abdulrafi was convicted in 1997 in state court on two counts of lewd and lascivious acts on a child under the age of fourteen in violation of California Penal Code Section 288(a) and was sentenced to prison for a term of eight years. He has served his time and has been deported to Pakistan. His petition for writ of habeas corpus is back on remand from the Ninth Circuit. This Court held an evidentiary hearing on the issue of ineffective assistance of his trial counsel. Based on the following findings of fact and conclusions of law, the petition is **DENIED**.

**STATEMENT**

**1.     PROCEDURAL HISTORY.**

As held in this Court's previous order denying petition for writ of habeas corpus dated March 5, 2005, petitioner has exhausted his state remedies. He first filed a petition for writ of habeas corpus in the California Court of Appeals for the Sixth District claiming that trial counsel rendered ineffective assistance by disclosing information to the prosecution that was

1  prejudicial to his defense.  The petition was denied June 28, 2000.  His petition to the
2  California Supreme Court for review of that order was denied August 9, 2000.  On
3  September 13, 2000, the California Court of Appeals affirmed the judgment of conviction.
4  Petitioner then filed a habeas petition in Santa Clara Superior Court, raising claims that
5  sentencing counsel was constitutionally ineffective.  The superior court denied the petition by
6  written order dated April 22, 2002.  His habeas petition to the state appeals court was denied
7  June 28, 2002.  The petition for review to the California Supreme Court was denied
8  September 25, 2002.

Petitioner first petitioned this Court for a writ of habeas corpus on September 27, 2002.  Petitioner contended that he was deprived of the effective assistance of counsel at his state court trial and sentencing and requested an evidentiary hearing.  This Court denied his petition and determined that petitioner was not entitled to an evidentiary hearing, in part, because he had not diligently sought to develop the factual record in state court.  Petitioner appealed to the Ninth Circuit.  While the appeal was pending, petitioner made three motions seeking to supplement the record on appeal.  In his first two motions to supplement the record, petitioner offered newly-discovered evidence regarding his trial counsel, Bramlett Hamilton.  The evidence indicated that some time after petitioner's trial, Hamilton had murdered his mother but was found not guilty by reason of insanity and was diagnosed with paranoid schizophrenia.  The Ninth Circuit denied petitioner's first two motions without prejudice but granted the third to supplement the record.  The subject of the third motion was that respondent had left out of the record before this Court petitioner's state court petition for habeas corpus.  The omitted portions of the state court record showed that petitioner, unbeknownst to this Court, had made a request for an evidentiary hearing in state court.  Consequently, the Ninth Circuit remanded the case for this Court to reconsider its denial of the petition in light of the new evidence.

**2.     EVIDENTIARY HEARING.**

Upon remand, this Court decided that a evidentiary hearing was warranted.  The hearing was limited without prejudice to issues relating to the defense investigator's reports.  At the evidentiary hearing, held on July 13, 2005, the Court made a pointed inquiry concerning what

1  issues needed to be determined in the entire case. At this hearing, petitioner's counsel limited
2  the inquiry to the scope of the July 13 evidentiary hearing and the issue of the investigator's
3  reports. Because petitioner has backtracked on this position by raising the issue of Hamilton's
4  mental health in his reply, this order will state the relevant portion of the transcript
5  demonstrating that the only issue tendered by petitioner's counsel was that concerning whether
6  the petitioner was prejudiced by Hamilton giving Alcala the investigator's reports (Tr.
7  9:21–11:12 (*emphasis added*)):

| | | |
|---|---|---|
| 8 | COURT: | What are the overall issues in the case that you want me to decide? In other words, maybe the original petition identified — I'm making this up — ten issues, but now are really only going to pursue one issue. ***I wouldn't want to go through this hearing thinking this is it and then, win or lose, you say, oh, no, now we have another issue to deal with. So tell me what issues there are in the case***. |
| 12 | COUNSEL: | The original petitioner identified two issues. The first claim of ineffective assistance about Bramlett Hamilton, trial counsel. Petitioner needs to prove that Mr. Hamilton was ineffective and that petitioner was prejudiced by it. The second claim in the petition was a sentencing issue. We have conceded that is moot, that is no longer part of this case. |
| 17 | COURT: | All right. So then coming back to ineffective assistance. What are the issues there that we have that you want to raise? |
| 19 | COUNSEL: | ***We allege, your honor, that the defense attorney provided improperly to the prosecutor copies of the reports, the defense investigator's reports, and that petitioner was prejudiced.*** |
| 22 | COURT: | Is there more than one report in issue? |
| 23 | COUNSEL: | There are three mentioned in the petition that are the — that provide the basis for our claim for prejudice. There were eight provided which we did not know until we received the files. |
| 25 | COURT: | Eight provided? So there are eight provided? |
| 26 | COUNSEL: | ***And the claim of prejudice is that Mr. Abdulrafi was prejudiced by the prosecutor's possession of and use of those reports.*** |
| 28 | COURT: | ***Is that your only claim?*** |

3

| | | |
|---|---|---|
| 1 | COUNSEL: | *It is.* |
| 2 | COURT: | *All right. So that's what we are going to hear about today.* |
| 3 | | |
| 4 | COUNSEL: | *That's correct.* |
| 5 | COURT: | *So, then the record — I need to decide this entire case — will be done by the end of today?* |
| 6 | COUNSEL: | *It will be* unless the Court wants to accept, for example, the deposition testimony as part of the post-hearing briefing. |
| 7 | | |

In light of the foregoing colloquy, it is clear to the Court that petitioner's counsel relinquished any and all claims other than the issue of the investigator's reports as addressed at the July 13 evidentiary hearing.[1]

The fundamental point by petitioner is that his trial lawyer erred in turning over his investigator's interview reports and that the prosecutor used the information in the reports to elicit damning testimony.  The fundamental conclusion reached herein is that the prosecutor was already aware of the witnesses in question; as such, the same basic information — all of which concerned only prior acts similar to those actually alleged and proven — would have been elicited regardless.  Thus, there was no substantial prejudice from any error by counsel.

At the July 13 hearing, respondent's witness was Javier Alcala, the district attorney who tried the case in state court.  Petitioner's witnesses were Teresita Guieb, the wife of the petitioner and Nancy Brewer, an Assistant Public Defender in Santa Clara County.  In lieu of personal appearance at the hearing, petitioner submitted the stipulated testimony of Paula Wright, who is in charge of maintaining files in the Santa Clara District Attorney's Office.  At the evidentiary hearing petitioner moved to expand the record with the files of Alcala and the files of Hamilton, both of which became part of the record without opposition and were filed

---

[1] In his reply brief, "[p]etitioner objects to any finding that Hamilton acted reasonably without a full evidentiary hearing on Hamilton's mental health. Petitioner submits that he would be able to demonstrate at any such hearing that Hamilton was suffering from significant mental health problems at the time of petitioner's trial, that ultimately led to his brutally murdering his mother, and that the presumption of reasonableness therefore cannot apply in this case" (Pet. Reply at 32). Not only did petitioner's counsel waive the issue of Hamilton's mental health as discussed, but, significantly, this order does not rely on *Strickland*'s presumption of reasonableness.  Rather, as addressed, even if it was unreasonable for Hamilton to turn over the investigator's reports, petitioner was not prejudiced by Alcala's possession and use of the investigator's reports.

4

under seal (Tr. at 3:6–15; 4:10–11). The Court also permitted the expansion of the record to include the sealed deposition of Alcala (Tr. at 120:3–14). Upon conclusion of the evidentiary hearing, the parties each submitted proposed findings of fact and conclusions of law and were given the opportunity to reply.[2]

A number of facts submitted by the parties, while arguably accurate, are irrelevant to the core issue. That a finding has not been incorporated into this order does not mean that the Court rejected its accuracy. This order will cite the record as the exception and not the rule. The Court now makes the following findings and conclusions of law.

## FINDINGS OF FACT

Except where noted, both sides agree to the following facts. Petitioner was represented at trial by Santa Clara County Deputy Public Defender Bramlett Hamilton. The people were represented at trial by Santa Clara County Deputy District Attorney Javier Alcala. The initial complaint against the petitioner alleged two counts of lewd and lascivious acts on a child under the age of fourteen in violation of California Penal Code Section 288(a).

At the time of petitioner's trial, Alcala had been a prosecutor for approximately fifteen years. He had been assigned to a number of different teams within the district attorney's office, had served as the supervisor of the narcotics team, and then was assigned to the sexual assault/homicide team. Over the course of his career, he had tried approximately thirty jury trials involving sexual assaults and was selected prosecutor of the year by his office for his work on the sexual assault team. In 1996 and 1997, during the months Alcala was preparing to

---

[2] In response to petitioner's proposed findings of fact and conclusions of law, respondent objected to petitioner's use of the transcript of Deputy District Attorney Javier Alcala's deposition. In support, respondent's counsel argues that she did not object to the expansion of the record to include the deposition testimony at the evidentiary hearing because she understood that it was admitted for the limited use of that part of the transcript being used during the hearing. This conclusion is contrary to the record. Upon petitioner's motion to expand the habeas record to include the deposition, respondent's counsel did not object and the Court stated on the record, "All right, so the entire deposition now comes in to [sic] evidence" (Tr. at 120:13–14). While the entire deposition did come into evidence, this order does not rely on any of the deposition outside of the specific portions that petitioner's counsel referred to during the evidentiary hearing. Similarly, this order does not rely on the deposition testimony of Nancy Brewer. Further, respondent moves to strike portions of petitioner's post-evidentiary briefing that go beyond the format that this Court set forth in its order for the parties' submissions of findings of fact and conclusions of law. Again, this order does not rely on this additional briefing.

5

1  prosecute petitioner, he had approximately ten felony sex cases at any given time and tried
2  approximately thirteen felony trials.
3      In March 1996, Alcala's supervisor filed the initial complaint against the petitioner,
4  alleging two counts of lewd and lascivious acts on a child under age fourteen in violation of
5  Section 288(a) involving victims Crystal Cecil and Jame Kelly. Alcala was assigned to the
6  petitioner's case some time between the filing of the complaint and the preliminary hearing on
7  May 3, 1996. Prior to the preliminary hearing, Alcala read various police reports. There was a
8  1994 police report and a 1995 police report (the latter involving the counts alleged). The 1994
9  police report involved prior bad acts. The 1994 report listed Candyce Herrara as a "victim" and
10 listed Charmaen Herrara as a "witness" who "corroborated with the victim's statement." The
11 police report included an incident when Candyce was playing dolls with petitioner's daughter,
12 Jasmyn, and she saw petitioner completely naked. The 1995 police report listed Crystal Cecil
13 and Jame Kelly as victims. The 1995 police report included a statement by Jame who described
14 how petitioner "touched her private parts" and she stated that "her friend, Charmaine [sic], told
15 her that Jasmine's [sic] father did the same thing to her. Charmaine also told Jame that he did
16 the same thing to her (Charmaine's) [sic] sister Candyce." Crystal and Jame testified at the
17 preliminary hearing. On May 13, 1996, an information, limited to the evidence presented at the
18 preliminary hearing, alleging violations of Section 288(a) involving Crystal and Jame, was filed
19 against petitioner.
20     One week after the preliminary hearing, Alcala provided Hamilton with a written list of
21 potential witnesses and asked for defense discovery under California Penal Code
22 Section 1054.3. Alcala's witness list included Candyce but did not include Charmaen. On the
23 same day, Alcala issued subpoenas for the first scheduled trial date to Candyce and her mother
24 Regina Villiron along with the two victims named in the information. Alcala never issued
25 additional subpoenas.
26     On September 11, 1996, the defense investigator interviewed Charmaen. On
27 September 16, 1996, she interviewed Candyce. On August 29, 1996, she interviewed Jasmyn,
28 the daughter of the petitioner. Parties were assigned a courtroom on January 23, 1997,

6

1  eight months after the preliminary hearing.  Over the course of the eight and a half months
2  between the preliminary hearing and the commencement of trial, there were numerous court
3  appearances.  On January 24, 2007, Alcala successfully moved *in limine* to admit the testimony
4  of Charmaen and Candyce as previous uncharged offenses (the prior bad acts in the 1994
5  report).

6      At some point before Alcala conducted his trial examinations, he received eight defense
7  investigator's reports from Hamilton.  There was no order for defense counsel to produce the
8  reports.  The reports were for witnesses Jassim Javaid, Lauren Jordan, Kathy Mathis, Tahir
9  Javaid, Corrine Morgan, Jasmyn Javaid, Charmaen Herrara, and Candyce Herrara.  Hamilton
10 did not give Alcala all the defense investigator's reports.  Hamilton was obligated by California
11 Penal Code Section 1054.3 to give Alcala the defense investigator's reports of any witness he
12 intended to call.  Hamilton called three of the eight witnesses for which he gave Alcala reports:
13 Kathy Mathis, Lauren Jordan and Jassim Javaid.  The parties agree that the reports of
14 Charmaen, Candyce and Jasmyn did not contain any information that was reasonably likely to
15 be viewed as favorable for Mr. Aldulrafi or helpful for settlement negotiations.  Four of the
16 disclosed defense investigator's reports related to witnesses called by the prosecution:
17 Charmaen Herrara, Candyce Herrara, Jasmyn Javaid, and Tahir Havaid.  Only one of the
18 witnesses, Candyce, was on Alcala's original witness list.  Charmaen appears on Alcala's
19 revised list.

20     At trial, Alcala called Candyce, Charmaen, Jasmyn and Crystal.  Candyce was the
21 first witness called by the prosecution, Charmaen was the third witness on the first day and
22 Jasmyn was the first witness called on the second day of trial.  The content of Alcala's direct
23 examination of these witnesses overlapped with the content of the defense investigator's
24 reports.  While petitioner disagrees, this order finds that the prosecutor's examinations did *not*
25 track the defense investigator's reports.  For example, as the parties agree, Alcala did not ask
26 Charmaen about the three incidents of lewd and lascivious acts in the same order as they appear
27 in the defense report.  Alcala did not elicit at least seven other separate incidents of lewd and
28 lascivious acts asserted by Charmaen in the defense report — incidents that could potentially

1  have been very useful to the prosecution.  For example, Alcala did not elicit Charmaen's
2  following assertions in the defense report:
3      1.    Petitioner squeezed her hard by the stomach when she was alone in the music
4  room.
5      2.    On several occasions petitioner picked her up and kissed her on the cheek.
6      3.    On several occasions petitioner went to the bathroom and left the door open.
7      4.    On about five occasions while she was spending the night, petitioner put her on
8  his lap and rubbed her stomach and back.
9      5.    Petitioner slowly videotaped every part of her from the head down.
10     6.    Petitioner left porn magazines all over the house, including the kitchen table.
11     7.    Petitioner asked Charmaen and a friend to come over and "put his hand on their
12 butts and pushed them."
13     In addition, during the trial examination of Candyce, Alcala did not elicit at least three
14 separate incidents of lewd and lascivious acts asserted by Candyce in the investigator's report
15 that could potentially have been useful to the prosecution.  For example, Alcala did not elicit
16 Candyce's following assertions in the defense report the following:
17     1.    Petitioner occasionally gave her a kiss on the cheek.
18     2.    Petitioner was always touching Jasmyn.
19     3.    She saw petitioner urinating in the bushes in front of his front yard.
20     Alcala also called Jasmyn.  Jasmyn is petitioner's daughter.  Jasmyn was the first
21 prosecution witness on the second day of trial.  On direct examination, Alcala asked Jasmyn if
22 she had told the defense investigator that Crystal appeared sad and upset at the end of the movie
23 and left without talking to Jasmyn.  Jasmyn denied telling this to the defense investigator and
24 Alcala did not attempt to impeach her.
25     At the evidentiary hearing, Ms. Nancy Brewer testified as to the practice of public
26 defenders with regard to giving district attorneys defense investigator's reports.  This Court
27 found Ms. Brewer to be a credible witness.  At the time of the trial (1996 and 1997), Ms.
28 Brewer was a deputy public defender in the Santa Clara County Public Defender's Office and

United States District Court
For the Northern District of California

was assigned to the research and training team.  She stated that in 1996 and 1997, it was the position of the Santa Clara County public defender's office that defense attorneys were not obligated to turn over reports prepared by defense investigators that pertained to prosecution witnesses with a few exceptions.  *First*, by statute, defense attorney were obligated to turn over the reports of any witness he intended to call.  *Second*, under case law, defense attorneys were obligated to turn over the reports if he intended to call the investigators who wrote the report.  In addition, Brewer stated that there may be tactical reasons as to why a defense attorney might produce the defense investigators' reports anyway.  The parties agree that it is a legitimate tactical decision for a deputy public defender to turn over a defense report if he intends to use it for impeachment when the witness is called to testify in order to avoid an objection by the prosecutor in front of the jury.  Consequently, the parties also agree that if Alcala had not received a copy of the defense investigator's report of Candyce prior to the time when Hamilton cross-examined her about specific statements she had made to the defense investigator, Alcala might have objected in front of the jury.

   At the evidentiary hearing, Alcala testified to whether he received the defense investigator's reports from Hamilton, when he received the reports and the extent to which he used the reports.  This order does not find Alcala's testimony at the evidentiary hearing entirely credible.  Alcala does not have an independent recollection of how or when or the extent to which he used the defense investigator's reports.  For example, when asked at the evidentiary hearing whether he had an independent memory of whether he interviewed Candyce and Charmaen before trial, he responded, contrary to a previously submitted declaration, "I don't remember the exact moment, if I did or not, where it would have been, how it would have been. I only remember, I believe — and this is vaguely — interviewing the Cecil Family.  I think it was the Cecil family" (Tr. 70:8–11).[3]

---

[3] Despite Alcala's testimony at the evidentiary hearing, Alcala signed a declaration in September 2003 affirmatively stating that "prior to the defense interviewing Candyce and Charmaen, [he] knew of them and had personally met and interviewed them" (Alcala Decl. ¶ 3).

9

Nonetheless, Alcala's responses were credible regarding his general practice as a seasoned trial attorney. *First*, this order finds that Alcala received the investigator's reports from Hamilton. As Alcala testified "in 23 years [he'd] never come across defense reports any other way but from the defense attorney" (Tr. 119:16–17). *Second*, Hamilton produced these defense reports before Alcala put on his witnesses — which may have been as early as January 23, 1997, when the parties were assigned a courtroom, five days before the actual trial began. *Third*, Alcala used the information found in the defense reports to prepare for his direct examinations at trial. Nonetheless, the defense reports were not Alcala's sole source of information regarding these witnesses. The 1994 and 1995 police reports included Charmaen's and Candyce's names. As Alcala stated, "I don't show up and out of the blue start calling people from the hallway and start asking them questions . . ." (Tr. 96:1–7). On the other hand, based in part on the testimony of petitioner's wife, this order finds that Alcala probably did not interview Jasmyn, the daughter of petitioner, who would have been a hostile witness.

## CONCLUSIONS OF LAW

1. **STANDARD FOR HABEAS CORPUS REVIEW.**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. 2254, applies. Under AEDPA, an application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a state court shall not be granted with respect to any claim already adjudicated on the merits in state court proceedings unless the adjudication of that claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. 2254(d).

As used in AEDPA, "contrary to" and "involve an unreasonable application of clearly established that federal law" have distinct meanings, though they may also overlap. A state court's decision is contrary to federal law if it fails to apply the correct controlling authority or if it applies the correct controlling authority incorrectly to a case involving facts "materially indistinguishable" from those in the controlling decision. A state court's decision involves an

10

unreasonable application of federal law if it correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or if it extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams v. Taylor,* 529 U.S. 362, 405–12 (2000). "Unreasonable" is not the same as incorrect. It is instead comparable to the "clear error" standard — *i.e.*, reversal is allowable only where the reviewing court is left with a "firm conviction" that error has been committed. *Van Tran v. Lindsey*, 212 F.3d 1143, 1153–54 (9th Cir. 2000). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." 28 U.S.C. 2254(e)(1).

As previously stated, the Ninth Circuit remanded the case for this Court to reconsider its denial of the petition in light of the new evidence that petitioner had diligently sought to develop the factual record in state court. Upon remand, the parties, as addressed above, have narrowed the issues of the original habeas petition.

**2.    PETITIONER'S CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL AND APPLICABLE LEGAL STANDARD.**

Petitioner raises one claim of ineffective assistance of trial counsel. Petitioner contends that trial counsel improperly disclosed the defense investigator's reports to the prosecutor. The disclosure purportedly gave the prosecution bad-acts evidence it previously did not have and that was improperly used to convict petitioner.

Petitioner's claims are governed by the Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984). A successful claim of ineffective assistance of counsel has two components. *First*, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. *Second*, the petitioner must show that counsel's errors were so serious as to deprive him of a fair trial. *Id.* at 691–94.

As to the first prong, a defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Judicial scrutiny of counsel's performance must be highly deferential and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

11

1  assistance." *Id.* at 689.  Petitioner bears the burden of overcoming the presumption that
2  counsel's actions were in accordance with sound trial strategies. *Id.* at 690.

3      Prejudice exists if there is a reasonable probability that, but for counsel's error, the result
4  of the proceeding would have been different. *Id.* at 695.  In making this determination, a court
5  hearing an ineffectiveness claim must consider the totality of the evidence before the judge or
6  jury. *Ibid.*  Furthermore, if it is easier to dispose of an ineffectiveness claim on the ground of
7  lack of sufficient prejudice, a court need not analyze whether counsel's action was reasonable.
8  *Id.* at 698.

                *        *        *

10      One issue is whether defense counsel's production of the three defense investigator
11  reports of Charmaen, Candyce and Jasmyn amounted to ineffective assistance of counsel.
12  Based on the foregoing findings of fact, this order finds that petitioner failed to meet his burden
13  to establish a Sixth Amendment violation.  It is arguable as to whether Hamilton's production of
14  the reports fell below an objective standard of reasonableness.  Even if it did, it is not
15  reasonably probable that the result of the trial would have been different.

16      Alcala's possession and use of the reports did not prejudice petitioner.  As to Jasmyn,
17  she was the daughter of petitioner and a hostile witness.  Alcala attempted to impeach her with
18  the report and was unsuccessful.  He asked her numerous questions regarding what she told the
19  investigator and she repeatedly denied making any such statements.  Because Alcala did not call
20  the defense investigator to refute her testimony, the jury could not imply that Jasmyn was not
21  telling the truth.  Consequently, Jasmyn's testimony, if anything, benefitted petitioner.

22      As to Charmaen and Candyce, petitioner has not met his burden in overcoming the
23  presumption that Hamilton had a tactical reason for turning over the reports.  At trial Hamilton
24  cross-examined Candyce, using the defense investigator's reports.  It is reasonable to conclude
25  that Hamilton turned over the reports to avoid an objection by Alcala during cross-examination
26  that might have suggested to the jury that he was taking advantage of the witness or hiding
27  information.  Given that Hamilton did not turn over all of the defense reports, it appears that he
28  did have a strategy in mind.  It would be enough to meet the reasonable prong if Hamilton

12

simply intended to impeach Charmean with the reports even though, as it turned out, he never did.

Even assuming, however, that Hamilton's production of the reports amounted to malpractice, however, petitioner has not shown prejudice. Alcala would have been fully capable of eliciting the same type of evidence from these two sisters. *First*, Candyce's name was on the 1994 police report as a victim and her sister was named as a corroborating witness. The 1995 police report also named Charmaen and Candyce. *Significantly, Alcala had these police reports in hand at least eight months before trial*. Alcala was well aware of Candyce's testimony from the beginning of the case, as he named her as a witness in his first witness list. Even if Alcala had nothing but the police reports, he could have elicited testimony from both girls on petitioner's acts of exposing himself to them. It is, moreover, highly unlikely that such a seasoned attorney as Alcala would have called a child as his first witness without interviewing her first. That there are no handwritten notes of interviews in his file does not prove the contrary. There are no notes in preparation of either the opening, closing or trial exams in his file. In the course of the last nine years, they were likely just thrown out. Furthermore, there are no facts suggesting that if they had been interviewed, the sisters would not have been cooperative. According to both the 1994 and 1995 police reports, Charmaen had consistently told both the police and friends that she and her sister were molested by petitioner. While the trial testimony does mirror the content of the investigative reports, Alcala's direct exams were not wedded to them. He re-prioritized the incidences, selected key facts and omitted others. While he more than likely used the investigative reports in his last-minute preparations for trial, Alcala already knew the basic facts.

Again — these witnesses were simply other "bad acts" evidence. They were not the main alleged victims. The evidence of guilt was overwhelming. Hamilton might have made Alcala's job a little easier by handing over the investigator's reports, but he did not provide information that influenced the ultimate outcome. Therefore, petitioner fails to meet the second prong of *Strickland*.

\*   \*   \*

For the foregoing reasons, petitioner has failed to establish that the state court's denial of his Sixth Amendment claim was objectively unreasonable. Consequently, petitioner's writ of habeas corpus is **DENIED**.

**IT IS SO ORDERED.**

Dated:  September 6, 2005

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE